# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

J. C. HILL, et al., )
)
         Plaintiffs, )
)
v. )    Case No. CIV-08-37-R
)
MARATHON OIL COMPANY, )
)
         Defendant. )

## ORDER

      The individual Plaintiffs, J.C. Hill and Alice Hill, have moved for class certification pursuant to Rule 23 F.R.Civ.P. Doc. No. 56. Defendant Marathon Oil Company (Marathon) filed its response opposing class certification [Doc. No. 94], Plaintiffs filed a reply [Doc. No. 98] and Marathon filed a surreply [Doc. No. 99]. On July 27, 28 and 29, 2009, the Court conducted an evidentiary hearing. *See* Minute Entries [Doc. Nos. 100, 101 & 102]. Thereafter, pursuant to the Court's Order, Plaintiffs and Defendant filed their proposed findings of fact and conclusions of law [Doc. Nos. 106 & 107]. On September 21, 2009, the Court heard closing arguments of the parties. *See* Minute Entry [Doc. No. 109]. The Court now addresses the motion for certification.

      Plaintiffs J.C. and Alice Hill own mineral rights in Section 31-9N-19W in Washita County, Oklahoma which are subject to an oil and gas lease dated October 19, 1998, covering the Northeast Quarter (NE/4) of Section 31, now owned by Defendant Marathon Oil Company, the assignee of the original lessee. A producing gas well, the Alice 1-31 well, is located in Section 31, and Plaintiffs have received royalty payment from Marathon for

production from that well for over ten years. Plaintiffs' lease provides in relevant part that the lessee is obligated:

> [t]o pay Lessors for gas of whatsoever nature or kind (with all of its constituents) produced and sold or used off the leased premises, or used in the manufacture of products therefrom, 1/5th of the gross proceeds received for the gas sold, used off the premises, or in the manufacture of products therefrom, but in no event more than 1/5th of the actual amount received by the Lessee, said payments to be monthly. . . .
>
> Defendant's Exhibit "15."

Defendant Marathon is an oil and gas exploration company which operates approximately 513 wells in Oklahoma, including the Alice 1-31 well. Marathon also owns non-operating interests in approximately 683 other wells in Oklahoma. Of the Oklahoma wells in which Marathon owns a non-operating interest, Marathon chooses to take in kind and market its own gas from two-thirds of the wells, rather than rely on the operator's gas marketing arrangements; however, the operators of those wells distribute the royalty payments. In the remaining one-third of the Oklahoma wells in which Marathon owns a non-operating working interest, Marathon markets its gas through the operator's marketing arrangements.

Plaintiffs claim that they and all lessors/royalty interest owners in wells in which Marathon is the operator or owns non-operating interests but markets the gas attributable to its working interests were paid royalty based on the same price in any given month, specifically a weighted average sales price (WASP) rather than on the true sales price or on the highest price reasonably available for any given month, and based on a volume less than

the measured wellhead volume for the well in question. Plaintiffs also claim that Defendant Marathon deducts the costs of gathering, compression, dehydration, treating and marketing, processes necessary to get gas in a marketable condition from the gas sales proceeds, before calculating royalty payments, resulting in the lessors or royalty interest owners improperly bearing their share of the costs of making the gas marketable. Plaintiffs assert that by calculating and paying royalty in this manner, Defendant Marathon breached the lease contracts, including the implied duty to market the gas, and breached its fiduciary duty owed to Plaintiffs. *See* Second Amended Petition at Counts I and II. Additionally, Plaintiffs claim that Defendant Marathon committed fraud and constructive fraud by misrepresenting the volumes of gas produced under the "Gross Quantity" section of monthly royalty statements as the actual volume of gas after substantial portions of it are given away to third party vendors as partial payment for transportation, gathering, dehydration, compression and processing, thereby concealing the facts that deductions were taken for dehydration, compression, processing, etc., that royalty interest owners royalty payments were not based upon the wellhead volumes, and that Defendant Marathon was in effect causing the royalty owners to bear a proportionate share of production or marketing costs. Plaintiffs also claim that by misrepresenting, omitting and/or concealing actual wellhead volumes, actual prices received from gas sales and price and volume deductions or deductions on its royalty payment check stubs, Defendant Marathon also violated the Oklahoma Production Revenue Standards Act, Okla. Stat. tit. 42, § 570.12. As Plaintiffs put it, they "claim these check stubs fraudulently misrepresented to class members that royalty payments were based upon the

actual price and volume of all residue gas and natural gas liquids (NGLS) produced and sold from Oklahoma wells" and that the check stubs "misrepresented, omitted and/or concealed price and actual volume deductions and/or reductions, the actual price received from gas sales, and the actual wellhead volumes of gas produced from Oklahoma wells, all in violation of the Production Revenue Standards Act (PRSA)." Plaintiff's Proposed Findings of Fact and Conclusions of Law [Doc. No. 106] at ¶¶ 15 & 16. In addition, Plaintiffs claim that Defendant Marathon's conduct which forms the basis of Plaintiffs' other claims unjustly enriched Marathon to Plaintiffs' detriment. Second Amended Petition at Count III. Plaintiffs also seek an accounting from Marathon for 100 percent of the production from the well at issue, *id.* at Count IV, and injunctive and declaratory relief, enjoining Marathon from further production from their properties until it has fully met its royalty obligations and defining Marathon's ongoing duties to Plaintiffs, past and future, *id.*, Count V.

Plaintiffs seek certification of a class defined as follows:

> All persons who own or owned minerals in the State of Oklahoma subject to an oil and gas lease from January 1, 2002 to the present, wherein (1) they received royalty on the sale and disposition of gas attributable to Marathon's interest in Oklahoma properties; and (2) their royalty payments were reduced as a result of the reduction of production volumes and/or production proceeds [expended] for marketing, gathering, compressing, dehydrating, treating, processing or transporting of hydrocarbons produced from the unit. Excluded from the proposed class are "agencies, departments or instrumentalities of the United States of America, or the State of Oklahoma, and/or persons whom Plaintiffs' counsel are, or may be prohibited from representing pursuant to the Rules of Professional Conduct, and/or overriding royalty owners and un-leased mineral owners who have elected under the OCC

4

> [Oklahoma Corporation Commission] forced pooling order to
> take the bonus/royalty option.

To obtain certification of this action as a class action under Federal Rule of Civil Procedure 23, Plaintiffs must first establish that the four requirements of F.R.Civ.P. 23(a), numerosity, commonality, typicality and adequacy of representation, are clearly met, "under a strict burden fo proof." *See* F.R.Civ.P. 23(a); *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006)(quoting *Reed v. Bowen*, 849 F.2d 1307, 1308 (10th Cir. 1988)). If all four of those requirements are clearly met, the Court must determine whether Plaintiffs have also satisfied one of the conditions of either Rule 23(b)(1), (2) or (3) that they assert are applicable. *See Valario v. Vandehey*, 554 F.3d 1259, 1267 (10th Cir. 2009), *citing Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The Court possesses "significant latitude in deciding whether or not to certify a class." *Vallario v. Vandehey,* 554 F.3d 1259, 1264 (10th Cir. 2009), citing, *Shook v. Board of County Commissioners*, 543 F.3d 597, 603 (10th Cir. 2008)(*Shook II*).

## Numerosity

To satisfy the first requirement of Rule 23(a), F.R.Civ.P., Plaintiffs must show that "the class is so numerous that joinder of all members is impracticable." F.R.Civ.P. 23(a)(1). The parties agree that the proposed class herein consists of approximately 11,000 royalty owners and that there is no dispute but that the numerosity requirement is met.

## Commonality

To establish the commonality prerequisite for class certification, Plaintiffs must show that "there are questions of law or fact common to the class." F.R.Civ.P. 23(a)(2). To meet this requirement, members of the putative class must "possess the same interest and suffer the same injury." *Trevizo v. Adams*, 455 F.3d at 1163, *quoting General Telephone Company of Southwest v. Falcon*, 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). A common question is one that can be resolved for every class member in a single hearing and does not require consideration of the individual circumstances of each class member. *Thorn v. Jefferson-Pilot Life Insurance Co.*, 445 F.3d 311, 319 (4th Cir. 2006). There need only be one issue of law or fact common to all class members to satisfy the element of commonality. *See Hallaba Worldcom Network Services*, 196 F.R.D. 630, 635 (N.D. Okla. 2000).

Defendant asserts that Plaintiffs have failed to establish this element because the evidence presented at the class certification hearing demonstrated that the resolution of the claims in this case will necessitate and turn on a consideration of the individual circumstances of and facts applicable to each class member, the terms of each member's lease, each well and other individualized circumstances. With respect to the fraud claim, Defendant asserts that the reliance element requires individualized inquiry and proof, which alone is sufficient to defeat a showing of commonality. Defendant's Proposed Findings of Fact and Conclusions of Law at p. 51. Additionally, Defendant Marathon points to evidence that its wells are located in 30 different counties; that it sells its gas to non-affiliated gas buyers which, together with other third party service providers, process Marathon's gas at

15 different gas processing plants and transport its gas, which from some wells may be to as many as 8 or 10 different interstate gas pipelines each month, and perform other services on Marathon's wells which it says led to the cost deductions from royalties at issue in this case. Defendant Marathon presented evidence that in a sample 2-month period, it sold its gas from various Oklahoma wells to 25 or 30 different gas purchasers in 85 to 90 different sales transactions, i.e., transactions occurring at different locations and times during that period. According to Defendant Marathon's evidence, it sells some of its gas at the wellhead under "Percentage of Proceeds" or "POP" gas contracts in which title to the gas passes to the purchaser at the wellhead but the price Marathon is paid is a percentage of what the purchaser receives for the sale of natural gas liquids [NGLS] and the residue gas, which values are reflected in royalty payments. As to wells in which Marathon is a non-operator, it chooses to market its gas through the operator's gas marketing arrangements about one-third of the time and, obviously, it markets the gas from its non-operating interest itself in two-thirds of the cases.

Defendant Marathon also introduced evidence that the prices it receives for gas sold from its wells may vary greatly because 1) Marathon sells gas at a number of different market locations – at the wellhead, at the inlet to the pipeline connected to the well, at the tailgate of the gas plant and at interstate pipeline connects; 2) the quality or MMBTU content of gas produced from different well varies and the processing and transport fees vary; 3) occasionally Marathon may sell gas under a 6-month fixed price contract; and 4) corrections, adjustments and credits may be made to payments received in prior months for gas sales.

Defendant Marathon also presented evidence that variances in the condition and quality of gas produced from the many wells impacts both the value or price received from the gas and the processes needed to make the gas marketable. Not surprisingly then, Defendant Marathon also introduced evidence that the processes employed by Marathon (gathering, compression, treatment, dehydration) and the amount of loss or unaccounted-for gas used as plant fuel or pipeline system fuel varies from well to well. Whether Defendant Marathon obtains the highest price reasonably available each month for the gas it sold from each of its 1,100 wells would present a highly individualized question, it asserts, that would require a well-by-well, month-by-month and sometimes day-by-day analysis of the particular facts and circumstances that apply to each property. *See* Defendant's Proposed Findings of Fact and Conclusions of Law. Marathon introduced evidence of factors that greatly affect gas prices, including the volume of gas sold, whether the gas is sold in a long-term agreement in part to induce the purchaser to build a gas processing facility or lay a pipeline to Marathon's wells, whether and how the price at which gas is sold is tied to an index price, the creditworthiness of potential buyers, and the NGL volume associated with the gas, etc. With respect to whether it is appropriate to pay royalty based upon the weighted average sales prices for gas that is commingled for marketing purposes, Defendant Marathon's expert witness Ms. Kris Terry testified that that is the norm in the industry and it is also the method of computing royalty payments which is most fair to the owners.

Defendant Marathon also presented evidence that language in the individual royalty owners' leases could restrict or eliminate the implied covenant to diligently market gas and

could also specifically exempt royalty owners from the deduction of production costs from their royalty payments. Kris Terry testified that unitization agreements governing some wells typically expressly allow deductions for some of the production costs about which Plaintiffs are complaining and modify any inconsistent lease provisions while division orders may "clarify" the intended meaning of leases and allow certain types of costs to be deducted from royalties. Some pertinent division orders, she testified, are older than Okla. Stat. tit. 52, § 570.11, which limits the effect of certain division orders.

Notwithstanding the plethora of differences among the wells Marathon operates or in which it owns non-operating interests, the quality of the gas produced therefrom and what processes the gas is subjected to, the various marketing methods employed and individual lease terms, there are several questions of law and fact common to all class members. These include when gas is in a marketable condition; whether Marathon has deducted costs incurred to put gas in a marketable condition and whether those deductions are improper because of the lessee's duty to market; whether transportation expenses may be deductible; whether Defendant Marathon is conducting a proper *Mittlestaedt*[1] analysis; whether Marathon is calculating royalty payments on less than the actual sales price of its gas and on less volume than that produced at the well and whether it has the right to do so; whether Marathon has used gas off the lease premises as fuel or in the manufacture of other hydrocarbon products without paying royalty and whether it has the right to do so; whether Marathon has the right

---

[1] *Mittelstaedt v. Santa Fe Minerals, Inc.*, 954 P.2d 1203 (1998).

to use percentages of gas and NGLs to pay third-party service providers without paying royalty on the amounts of gas and NGLs used; whether Defendant Marathon owes fiduciary duties to the class members; whether Marathon's implied duty to market is owed to all class members and whether it has breached its duty; and whether Defendant Marathon violates the Production Revenue Standards Act, Okla. Stat. tit. 52, § 570.12, in the manner in which it reports volumes, sale prices and deductions on its check stubs to royalty owners. As in the *Naylor Farms* case, "whether Defendants' breached their obligations under the various leases by incorrectly calculating royalties is an issue that undergirds every claim." *Naylor Farms v. Anadarko OGC Company*, CIV-08-668-R (W.D. Okla. Aug. 26, 2009) at p. 10. "[T]he issue is not whether there were appropriate post-production costs that might be shared by the royalty owners, but rather were hidden production costs [and production costs that were disclosed] unfairly borne by the royalty owners?" *Id.*

While there are common questions of fact or law relating to Plaintiffs' claims that Defendant misrepresented or failed to disclose gas volumes, sales prices and deductions on its royalty payment check stubs and violated the PRSA, as well as relating to Plaintiffs' claims that Defendant breached fiduciary duties owed to the class members, Plaintiffs have failed to demonstrate that there are any questions of law or fact common to all class members as to their claim, whether predicated on contractual or fiduciary duties, that Defendant failed to pay royalties based upon the highest possible market price or the highest price reasonably available. Indeed, Defendant presented evidence that this determination would involve

10

analysis of markets and market prices available for gas from each well on a month-by-month or perhaps even daily basis.

The fact that individual damage determinations will be necessary in this case does not destroy the existence of commonality. *See Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 427-28 (4th Cir. 2003)(*citing, inter alia*, F.R.Civ.P. 23 Advisory Committee Note to 1996 Amendment, subdivision (c)(4)).

### **Typicality**

The typicality requirement limits the class claims to those "fairly encompassed" by the claims of the named plaintiffs. *General Telephone Co. of the Northwest, Inc. v. Equal Employment Opportunity Commission*, 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319, (1980). A named plaintiff's claim is "typical" when it arises out of the same event, or practice or course of conduct of the defendant, and is based on the same legal theory on which the class claims are predicated. *See Baby Neal v. Casey*, 43 F.3d 48, 57-58 (3rd. Cir. 1994). Typicality is satisfied when the named class representatives will by establishing their own claims establish the bulk of the elements of each class member's claims. *See Brooks v. Southern Bell Tel. & Tel. Co.,* 133 F.R.D. 54, 58 (S.D. Fla. 1990), *citing General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). Claims may be typical without being identical. Thus, "typicality may be satisfied even though varying fact patterns support the claims or defenses of individual class members or there is a disparity in the damages claimed by the representative parties and the other members of the class." *In re Four Season Securities Laws Litigation*, 59 F.R.D. 667, 681 (W.D. Okla. 1973),

*rev'd on other grounds*, 502 F.2d 834 (10th Cir. 1974). As with commonality, individual damage questions do not prevent class action certification. *In re Texas International Securities Litigation*, 114 F.R.D. 33, 44 (W.D. Okla. 1987).

The claims advanced by the named Plaintiffs, with the possible exception of their fraud claim, will encompass the claims of the class members and proof of their claims will establish the bulk of the elements of each class member's claims. This is particularly true in this case where Defendant Marathon treated all royalty owners the same with regard to deductions for production costs and volumes of gas on which it paid royalty, regardless of well location or lease terms (except in a very small percentage of leases expressly specifying that dehydration, compression, processing, etc. expenses may not be deducted from the royalties paid). The representative Plaintiffs' fraud claims, like those of all class members, will be predicated at least in part upon information contained on the royalty payment check stubs. However, because the representative Plaintiffs went to the well site of the Alice No. 1-31 well and recorded daily meter readings of the wellhead volume of gas produced; made several telephone calls to Marathon to question why their royalty checks were in an amount less than what they thought they should be; received a letter from an attorney at Marathon responding to some of Plaintiffs' questions, which they claim contained inaccurate information; and were aware of the *Barnaby v. Marathon Oil Company* proposed class action royalty settlement when the named Plaintiffs discovered or could have discovered the alleged fraud and hence when the statute of limitations applicable to their fraud claim began to run as to them may differ substantially from when class members discovered or reasonably could

have discovered the alleged fraud and when the applicable statute of limitations began to run as to them, the representative Plaintiffs' fraud claim is not typical of the putative class members' fraud claims. Thus proof of the named Plaintiffs' fraud claims will not establish the bulk of the elements of each class member's claims. Likewise, whether the representative Plaintiffs reasonably relied on the representations as to volumes, price and deductions contained on the royalty payment check stubs and/or information obtained by telephone or letter from Marathon may differ substantially from whether other class members reasonably relied on the information included on the royalty payment check stubs. Indeed whether class members relied on the information on royalty payment check stubs and did so reasonably, an essential element of a fraud claim, is a uniquely individualized question and because of this, the representative Plaintiffs' fraud claim cannot be said to be typical of those of the class. With respect to Plaintiffs' other claims, however, the requirement of typicality is satisfied. Application of the statute of limitation defense to the claims of the representative Plaintiffs and those of other class members for breach of fiduciary duty may vary some in effect, but limitations on the scope of such claims will not alter the nature of those claims. The Hill Plaintiffs' breach of contract, breach of fiduciary duty, violation of the PRSA, unjust enrichment and accounting claims and their claim for declaratory and injunctive relief are typical of those of the putative class members and proof of the named Plaintiffs' claims will establish the bulk of the elements of those claims for the class members.

**Adequacy of Representation**

The final requirement of Rule 23(a), F.R.Civ.P., is that the named Plaintiffs and their counsel must establish that they will adequately represent the class. "Resolution of two questions determines legal adequacy: (1) do the named Plaintiffs and their counsel have any conflicts of interest with other class members; and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002)(quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (10th Cir. 1998)).

In this case there is no evidence of any existing or potential conflicts of interest between the representative Plaintiffs and/or their counsel and the class. The Court finds that Plaintiffs J.C. and Alice Hill are knowledgeable royalty interest owners who have kept and produced their own meter readings and documents relevant to this case, actively assisted their attorneys in the prosecution of this case, given their depositions in this case and testified at the evidentiary hearing on Plaintiffs' Motion to Certify Class. J.C. Hill's testimony at the evidentiary hearing demonstrated his understanding of the issues in this case. By their testimony at the evidentiary hearing, the Hills demonstrated that they are able and willing to fairly and vigorously prosecute this action on behalf of the class members. Additionally, the Court finds that Plaintiffs' lead counsel, R. Brad Miller, is an experienced trial lawyer who is currently involved in three class action lawsuits involving oil and gas issues and whose law firm is involved in six class actions. The same is true of Michael L. Darrah and Edd Pritchett, Jr., two of Plaintiffs' other lawyers in this case. Additionally, those lawyers have associated with the attorney who represented the Plaintiff class in *Bridenstine v. Kaiser*

*Francis Oil Co.,* a royalty owners' class action previously litigated in Oklahoma. Plaintiffs' counsel's performance to date both in their pleadings and briefs and at the evidentiary hearing on the motion to certify class leaves no doubt but that they will ably and vigorously prosecute this action on behalf of the class.

### **Rule 23(b)**

Having concluded with regard to most of Plaintiffs' claims that Plaintiffs have satisfied the requirements of Rule 23(a), the Court must now determine whether this action qualifies for class certification under F.R.Civ.P. 23(b)(1)(A), (b)(1)(B), (b)(2) and/or (b)(3). Plaintiffs assert that class certification is appropriate under each of those subsections of Rule 23(b), F.R.Civ.P. The Court concludes that Plaintiffs have established that a class action is appropriate under Rule 23(b)(3) and, accordingly, the Court finds it unnecessary to address the applicability of Rule 23(b)(1)(A) or (B) and Rule 23(b)(2), F.R.Civ.P.

Rule 23(b)(3) of the Federal Rules of Civil Procedure provides that a class action may be maintained if Rule 23(a) is satisfied and the Court finds that questions of law or fact common to members of the class predominate over any questions affecting only individual class members and that a class action is superior to other methods available for fairly and efficiently adjudicating the controversy. F.R.Civ.P. 23(b)(3). Factors pertinent to the superiority prong include the class members' interests in individually controlling the prosecution of separate actions; the extent and nature of any litigation concerning the controversy already begun; the desirability or undesirability of concentrating the litigation

of the claims in the particular forum; and the likely difficulties in managing the class. F.R.Civ.P. 23(b)(3)(A), (B), (C) & (D).

The "predominance" element is concerned with whether the named plaintiffs can offer proof on a class-wide basis. *See Hyderi v. Washington Mutual Bank, FA,*, 235 F.R.D. 390, 398 (N.D. Ill. 2006). Thus, predominance and commonality overlap considerably. *See Newberg on Class Actions* § 4.23. "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject to only individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d. Cir. 2002). Predominance is ordinarily satisfied when plaintiffs have alleged a common course of conduct by the defendant. *In re Janney Montgomery Scott LLC Financial Consultant Litigation*, 2009 WL 2137224 (E.D. Pa. 2009). In this case, Plaintiffs' claims arise from Marathon's "uniformity of obligation" to its royalty owners, as well as Marathon's "uniformity of performance" in calculating royalty payments, such that the element of predominance is satisfied, and class treatment is appropriate. *See S. Gensler,* "Class Certification and the Predominance Requirement Under Oklahoma Section 2023(B)(3)," 56 Okla. L. Rev. 289, 306 (2003). Questions of law and fact common to all class members which predominate over individualized questions including the following: 1) When is gas "marketable" or how is the term "marketable" defined for purposes of determining when gas is a "marketable product" or in a "marketable condition"? 2) What processes and costs thereof are necessary to make gas marketable? 3) May a lessee/producer

indirectly pay a midstream purchaser to perform gathering, compression, dehydration, processing and treating by agreeing to accept as a purchase price for the gas only a portion of what the midstream purchaser receives from sale of such gas to an interstate pipeline after the midstream purchaser has performed some or all of the services described? 4) Whether Marathon has deducted costs incurred to put gas in a marketable condition and whether those deductions are improper because of the lessee's duty to market? 5) Whether transportation expenses may properly be deducted from royalties? 6) Whether Marathon is conducting a proper *Middelstaedt* analysis? 7) Whether Marathon is calculating royalty payments on less than the actual sales price of its gas and on less volume than that purchased at the well and whether Marathon has a right to do so? 8) Whether Marathon has the right to use percentages of gas and NGLs to pay third-party service providers without paying royalty on the amounts of gas and NGLs used? 9) Whether Marathon breached the implied duty to market? and 10) Whether Marathon violates the PRSA in the manner in which it reports volumes, sale prices and deductions on its check stubs to royalty owners?

Putative class members, each of whose royalty interests may be quite small, would have little incentive to prosecute their claims individually because their costs would likely exceed the value of their individual claims. Thus, class treatment is a superior option here because "the alternatives are either no recourse for thousands . . . to whom the courthouse would be out of bounds, or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *Green v. Wolfe Corp.*, 406 F.2d 291, 301 (2d. Cir. 1968). Neither the parties nor the Court are aware of any litigation against

Marathon pertaining to alleged improper royalties paid after 2002, the period to which this litigation is limited. It makes sense and is desirable to conduct this litigation in Oklahoma, the situs of the wells and the location of the genesis of this dispute, even though not all of the royalty owners are Oklahoma residents. The identities of the class members are easily ascertained from Defendant's payment records and county registers of deeds. No particular difficulties in managing this class action have been brought to the Court's attention and "[m]anageability problems are significant only if they create a situation that is less fair and efficient than other available techniques." *Home-Stake Production Co. Securities Litigation*, 76 F.R.D. 351, 375 (N.D. Okla. 1977). A class action "would achieve [greater] economies of time, effort and expense, and promote [enhanced] uniformity of decisions as to persons similarly situated" than would individual actions. F.R.Civ.P. 23, Advisory Comm. Note (1966). The superiority prong of Rule 23(b)(3) is clearly established in this case.

## **Conclusion**

In accordance with the foregoing, Plaintiffs' motion for class certification [Doc. No. 56] is GRANTED and the Court certifies this action as a class action pursuant to F.R.Civ.P. 23(a) and (b)(3), the class being defined as set forth at pp. 4-5 of this Order.

IT IS SO ORDERED this 9th day of June, 2010.

_David L. Russell_
DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE